## JOSEPH BADGER *versus* THE OCEAN INSURANCE COMPANY.

A ship belonging to the master and others, and insured for the benefit of the own-
ers, was stranded, and the master, without notice to the other owners or to the in-
surers, and without any justifying necessity, sold her, and in a few days after the
sale the other owners saw the master and they all joined in an offer of abandon-
ment, and sent with it an account of sales. The other owners did not then, nor at
any subsequent time, expressly disaffirm the sale, and the insurers did not expressly
accept or refuse the abandonment, nor ever received the proceeds of the sale. The
insurers sent an agent to take possession of the ship, intending to repair her and
restore her to the assured, but the purchasers insisted on their right under the sale,
and the insurers then bought her of the purchasers, for a consideration independent
of the abandonment, and repaired her and kept her for their own use, and never
offered to restore her to the assured. It was *held,* that the assured had affirmed the
sale by the master, and consequently had no interest in the ship on which the aban-
donment could operate ; and that the insurers did not accept the abandonment, but
took, and were entitled to hold, under a distinct and independent right.

ASSUMPSIT on a policy of insurance executed by the de-
fendants, on the brig Malaga, for the sum of $ 8000, for one
year from the 27th of August, 1835. The cause was tried
before *Shaw* C. J.

It appeared that the brig was owned by Abel Sawyer, who
was also the master, Joseph Badger and Joseph P. Bradbury,
all of Portland, Maine ; and that the insurance was effected,
and this action was prosecuted, for the benefit of all the
owners.

On the 15th of July, 1836, the brig, then on a voyage from
Pictou to Somerset in Massachusetts, with a cargo of coal,
went on shore, in a fog, on Gardner's Island, near Long Isl-
and, New York. The next day the master went to Sag Har-
bor, on Long Island, called a survey on the vessel, and after
receiving the surveyors' report, advertised the vessel and cargo
for sale ; and by his order they were sold by auction on Mon-
day, the 18th of July. The vessel and cargo were purchased
by John Clark and others, for $ 2195, and the purchasers went
to the vessel on Wednesday, the 20th of July, and on that
day, having taken out about one third of her cargo, they got
her off. They found that she did not leak, and that the car-
go was not shifted.

The plaintiff waived the ground that there was any justify-

ing necessity for the sale, or any injury to the vessel which would have amounted to a constructive total loss, or other cause which would render an abandonment effectual without an acceptance of the same, or a ratification of the sale, on the part of the insurers ; and the case was reserved for the whole Court, upon the question whether the conduct of the insurers or their agents, constituted such an acceptance or ratification.

The master, immediately after the sale, went to New London and thence to Portland, but made no communication to the defendants until his arrival at Portland, when he and the other owners, on the 21st of July, wrote and signed an abandonment ; which was forwarded to the defendants and received by them, together with an account of sale of the vessel, on the 22d of July.

The purchasers carried the vessel to Greenport, Long Island, where James Bergen, an agent of the defendants, procured possession of her, in the manner hereinafter stated. Bergen delivered her to one Gifford, by whom she was taken to Newport, Rhode Island, and there repaired under the care and superintendence of N. J. Ruggles, an agent of the defendants, and at their expense. After being repaired she was brought to Boston, but was never offered to the plaintiff.

The evidence on which the plaintiff relied to show an acceptance of the abandonment, or a ratification of the sale, was contained principally in the depositions of Bergen, Ruggles and Gifford.

Bergen testifies, that he resides in New York ; that he is an insurance broker, a notary public, and an agent for underwriters ; that he is the agent of the defendants to survey damaged vessels and property, at the port of New York, insured by the defendants ; that this is the extent of his regular agency ; that he is often agent for special purposes ; that he acted as agent for the defendants, in relation to the Malaga, which had been on shore on Gardner's Island ; that when he says he was agent for the defendants, he also means to say that he was acting for whom it might concern ; that he expected that the result of his labors and the examination of the circumstances attending the vessel, would show whether the underwriters were liable, and consequently whether he was acting for them ; that he received a letter dated the 20th of July, from

the president of the Ocean Insurance Company, in which the president says he has just learned that the Malaga, with a cargo of coal, is lost at Sag Harbor, and that she is insured by the company to the amount of $8000, and he requests the witness to give his attention to her if he thinks he can do any thing to save her ; that he received another letter, dated the 22d of July, in which the president says, " I have just received the abandonment of the brig, with protest, accounts of sales of the whole, &c. It appears to me there has been no kind of exertion made to get the brig off, and that the captain had no right to sell the whole concern at auction, without giving us notice. Still I do not know her situation, but wish it looked into. I shall not accept the abandonment ; and whether it is proper for us to take charge of the vessel and get her off now she is sold, I do not exactly know ; but perhaps some arrangement can be made with the purchaser. If the vessel can be got off by any arrangement, repaired and delivered to the owners, it would be a good thing. Will you please look after the brig and do what you think best "; that the authority under which the witness was acting was verbally derived from the president of the company and one or two of the directors ; that the president wished the witness to proceed to the vessel with all despatch and get her off if possible ; that the president said he believed she had been illegally condemned and sold, and that the company would not be ultimately liable for the loss, and he therefore wished the witness to proceed cautiously and not to commit the company in any way, but to do what was most for the interest of all concerned ; that the witness immediately left Boston for Gardner's Island ; that after his return, the president of the company desired him to go again to the vessel and ascertain all the facts relative to her condemnation and sale, and to get possession of her for their benefit, or for the benefit of the owners, as the case might be, for it was necessary that she should be out of the hands of third parties ; that the witness found her at Greenport, in the possession of John Clark and others ; that he purchased the brig and her cargo of Clark and others, for $5130, the sum fixed as the price of the vessel being either $2500 or $3000, he could not recollect which ; that he was acting for whom it might

30

concern, and expected that the result would show for whom he purchased, as he did not then know whether it would be considered as a total or a partial loss ; that the payment was made in cash furnished by the company ; that when he first saw the brig, at Greenport, she did not leak, and could not have leaked, as she had nothing but bilge water in her ; that she had sustained no damage, except what the master himself had caused by cutting away the masts ; and that Gardner's Island is in the most favorable situation for getting vessels off shore.

Ruggles testifies that he resides at Newport, Rhode Island ; that he acted as agent of the defendants in relation to the brig Malaga ; that he received a letter from the president of the company, dated the 24th of July, stating that he had received an abandonment, protest, memorandum of sales of vessel and cargo, and a survey, and saying, " Mr. Bergen goes back to New York to-day, with the intention of going from there immediately with a vessel, &c. prepared to take possession of the brig, get her off, and deliver her over to the owners. I do not know whether it is best to take forcible possession of the brig and her appurtenances, to libel her, to replevin, or purchase her back of those who have possession ; but it is clear in my mind, that the present holders have no legal right to her, except that the captain, being part owner, had a right to sell his part, and he may have a power from the other owners to sell ; but if the sale was made merely in consequence of her situation, it is in my opinion illegal." — " Since writing the foregoing, Mr. Bergen has called on me, and we have concluded that it is best that he should, instead of going to New York, stop at Newport, and request you to go over to the Malaga with him. Take with you a vessel and any thing that in your opinion may be wanted to accomplish your object ; and take such measures to take charge of and repair the vessel as may be thought proper, and I will hold the office for all expenses, and any acts of yours in order to accomplish the desired object ; and you will please draw on me at sight for any funds wanted ;" · that the vessel was brought to Newport by Gifford and others, with her full cargo on board, and when she arrived, was in the witness's charge for whoever was interested in her ; that he sold the coal at Fall River, where the brig went and delivered

t, except about twenty-six chaldrons, which she brought back to Newport for ballast; that this portion of the coal, which was on the bottom of the hold, was dry and dusty and had not been wet : that after the brig was unloaded, she was hauled to Gardner's wharf in Newport, about the last of September, where she lay about four months, and during all that time she continued unusually tight; that about the middle of January, he was directed to fit her for sea, and he accordingly did so, that he hove her down; that he found her bottom generally in good order, except her shoeing on her keel, which was rubbed off most of the distance on her keel; that most of the copper was uninjured, but some of it on her keel was rubbed off and rolled up, so as to require forty or fifty sheets to be taken off and replaced; that the seams in her bottom were perfectly tight; that the keel was not crooked or hogged in the least; that she was not strained on the garboard, nor in her butts or plank shears; that the cost of repairing the hull was from $60 to $100; that she was repaired at Newport and fitted for sea, under the direction of Captain Croswell, and the whole was completed about January 1837; that the witness paid the bills, which, including expenses of every description, amounted to about $3000; that he was repaid, partly by the net proceeds of the cargo, being about $1200, and partly in cash, received of John Preston, (who was the secretary of the insurance company;) that the brig stood in the name of Preston, when she left Newport; that she was then in better condition than when she went on shore, and in the estimation of the witness, her value was about $6000.

Gifford testifies, that at the request of Ruggles he sailed for Gardner's Island to assist in getting off the brig, but that he found her at Greenport; that Bergen came there and bought the brig of Clark and others, and asked the witness to repair her and buy all that formerly belonged to her, and what he could not buy, to supply with new materials, and then take the brig to Newport and await the orders of Ruggles; that he pu in two new masts at Greenport; that he bought the standing rigging, and the sails, which had been taken off the brig; that after the brig arrived at Fall River, he found that the running rigging was in the possession of one Snell; that he told Snell

he had better give it up ; that Snell replied that Captain Saw-
yer had given it to him ; that the witness said, if Sawyer had
given him the rigging and he had any thing to show for it, he
had better keep it, if not, he ought to give it up ; that Snell
gave up the rigging and several other articles, and said he had
left the kedge anchor with one Bowen, of Newport ; that the
witness found by a memorandum, that the anchors were sold to
Sawyer ; that he found the kedge anchor at Bowen's, and
claimed it as belonging to the brig ; that Bowen said he had
advanced Snell $10 upon it, but the witness might take the an-
chor and he, Bowen, would look to Snell for the money ; that
Snell claimed no payment of the witness for the articles surren-
dered, nor did the witness pay him or any one else for those arti-
cles ; that he was authorized by Bergen to make the repairs on
the vessel, and he made them under the direction of Ruggles.

A nonsuit was ordered, subject, &c.  If the Court should
be of opinion that the defendants were liable, either for a total
or a partial loss, judgment was to be entered up for the plain-
tiff ; unless the Court should be of opinion that the question of
the actual intent of the defendants to accept the abandonment
was material and a proper question to be referred to a jury.  If
the Court should be of opinion that there was no total loss,
then, on motion of the plaintiff, the case might be submitted to
an assessor to report whether there was a partial loss.

*F. C. Loring*, for the plaintiff.  The loss was not total
originally, but the defendants have made it so by their own
acts.  The abandonment must be deemed to have been accept-
ed, 1. from the silence of the defendants ; *Pickard* v. *Sears,*
6 Adolph. & Ellis, 474 : *Heane* v. *Rogers*, 9 Barn. & Cressw.
487 ; 3 Barn. & Ald. 318, note ; and 2. from the legal opera-
tion of their proceedings.  Where an insurer takes possession
of the vessel after an abandonment, the assured has a right to
presume that he accepts the abandonment, or that he intends
to repair the vessel and restore her to the owner.  There may
be a constructive acceptance, even in the case of an express
refusal to accept.  The defendants' agent was instructed to
get possession of the brig at all events ; but they had no
right to take her from third parties, or to libel or replevy her,
unless they accepted the abandonment.  *Commonwealth Ins.*

*Co.* v. *Chase,* 20 Pick. 142. They intended to act as insurers and not as purchasers, and accordingly they demanded and received the running rigging, kedge anchor, and other articles, without paying for them. Both by their silence, in not giving notice of a refusal to accept the abandonment, and by their acts, they led the owners to believe, that the abandonment was accepted, and thus prevented them from taking measures to reclaim the property. *Wood* v. *Lincoln and Ken. Ins. Co.* 6 Mass. R. 484; *Peele* v. *Suffolk Ins. Co.* 7 Pick. 257; *Hudson* v. *Harrison,* 3 Brod. & Bingh. 106; *Peele* v. *Merchants' Ins. Co.* 3 Mason, 81, 82; 3 Kent, (3d edit.) 320; *Livermore* v. *Newburyport Ins. Co.* 1 Mass. R. 277; *Smith* v. *Newburyport Ins. Co.* 4 Mass. R. 668; *Martin* v. *Salem Mar. Ins. Co.* 2 Mass. R. 420; *Ogden* v. *New York Fire Ins. Co.* 10 Johns. R. 177; *Columbian Ins. Co.* v. *Ashby,* 4 Peters, 139; *Chesapeake Ins. Co.* v. *Stark,* 6 Cranch, 268; *Smith* v. *Robertson,* 2 Dow, 474.

But if the defendants acted as purchasers, then they ratified the master's sale, and thereby made it a total loss. *The brig Sarah Ann,* 2 Sumner, 206.

*Choate* and *Peabody,* for the defendants. The sale was originally binding as to the master's share of the vessel, and the abandonment offered was a confirmation of it by the other owners. The sale then being valid, the abandonment was ineffectual, there being nothing on which it could operate, and the acceptance of such an abandonment must be a nullity. *Amory* v. *Hamilton,* 17 Mass. R. 109; *Harvey* v. *Turner,* 4 Rawle, 230; *Bredin* v. *Dubarray,* 14 Serg. & Rawle, 27, 30; *Clement* v. *Jones,* 12 Mass. R. 60; *Towle* v. *Stevenson,* 1 Johns. Cas. 110; *Cairnes* v. *Bleecker,* 12 Johns. R. 300, 2 T. R. 189; 4 Kent, (3d edit.) 615; 1 Livermore on Principal and Agent, 49, 392, 393; *Copeland* v. *Mercantile Ins. Co.* 6 Pick. 203.

An implied acceptance is not favored; and will not be presumed from acts done *diverso intuitu.* The defendants have never, in terms, assented to this abandonment; on the contrary, their expressed intent was to refuse it. Mere silence on their part will not be construed into an acceptance; nor can an acceptance be inferred from their acts. Supposing the vessel

Badger
*v.*
Ocean
Ins. Co.

still aground, they intended, at first, to protect themselves by taking possession of her, in order to repair her and restore her to the owners ; but it was found, that she was afloat and in safety, and in the hands of persons insisting on their right by purchase ; and the defendants were obliged to relinquish that course of proceeding. Consequently, when as a measure of precaution they bought the vessel, they did not take under the assured, but under a distinct independent right as purchasers, not as insurers. *Walden* v. *Phœnix Ins. Co.* 5 Johns. R. 310 ; *Parmeter* v. *Todhunter*, 1 Campb. 541 ; Phillips on Ins. 447, 449, 450, 500 ; *Beatty* v. *Marine Ins. Co.* 2 Johns. R. 114 ; *Thelluson* v. *Fletcher*, 1 Esp. R. 73 ; *Griswold* v. *New York Ins. Co.* 3 Johns. R. 330.

*C. G. Loring*, in reply. The defendants object, that an abandonment without sufficient cause is void, and therefore the acceptance of such an abandonment is likewise void ; it would be more correct to say, that the abandonment is void unless accepted, and that an acceptance with a full knowledge of the facts, renders it valid.

The assured cannot be considered to have ratified the master's sale, either on the ground of acquiescence, or by the abandonment. Their omission to repudiate the sale immediately was not a ratification, because upon the survey and the master's representations, they supposed it was justifiable ; and before they knew to the contrary, the defendants had bought and taken possession of the vessel. The abandonment was not *ipso facto* a ratification, for then neither the assured nor the underwriters could have reclaimed the vessel.

It is said, there was no intention to accept the abandonment ; but there clearly was an intent to take possession as insurers, and taking possession in order to repair is an acceptance, unless the vessel shall be restored within a reasonable time.

It is said the defendants took under a distinct title from that of the assured ; but if they intended to purchase and hold as owners, without notice to the assured, it was a fraud on the assured, who made the abandonment in good faith, and had sufficient reason to believe it had been accepted.

PUTNAM J. delivered the opinion of the Court. The counsel for the plaintiff have, as we think, very properly

waived the ground, that there was any justifying necessity for a sale on account of any injury sustained by the vessel's having been stranded, which would, in a pecuniary point of view, amount to a constructive total loss.

After the abandonment, the defendants sent one or more agents to take possession of the vessel and repair her for the assured, but the purchasers would not give her up ; and she was purchased for about five thousand dollars, of the vendees of Captain Sawyer. She stands in the name of John Preston, but it is not denied by the defendants, that they furnished the money to pay for her ; and they have taken and fitted her up, and employed her for their own use, and have not offered her to the original owners, the assured.

Under these circumstances, the owners contend, that they are entitled to recover for a total loss ; not, to be sure, because even an apparent or probable technical total loss has happened, but because the underwriters have so conducted themselves, as that in the eye of the law they have accepted the offer of abandonment. The plaintiff says, that the vessel has been stranded, and has received damage from perils within the policy, within the year ; that after an offer of abandonment was made, the defendants took the vessel and repaired her, and employed her on their own account, and have never, to this day, offered to restore her to the former owners. It is argued for the plaintiff, that this case falls within the case of *Peele* v. *The Suffolk Ins. Co.* 7 Pick. 254, and that the defendants have rendered themselves liable, notwithstanding their declared intent not to accept the offer of abandonment. And it is true, that the Suffolk Insurance Company did not intend to make themselves liable, but were made so against their intent, in consequence (as the jury found) of not making the repairs which they undertook to make upon the vessel, in a reasonable time.

It is very clear, that if the conduct of the party implies an acceptance of the abandonment, such acceptance is to be legally presumed, notwithstanding the declared intent of the party to the contrary ; the actual intent in such case being immaterial. It is for the defendants to explain the transaction, and they rely upon the other facts in the case for an explanation of their conduct, as being consistent with their declared intent

The question is, whether the defendants have so conducted themselves, as that they have acceded to the offer of abandonment and made the vessel, or the proceeds of the sale of the same, their own, against their protestations to the contrary. They deny the proposition, that they have taken the vessel under the abandonment, and contend that they have taken her under a purchase from the vendees of the owners.

The legal operation of an abandonment is to transfer to the underwriters all the property which is offered to be ceded, to the end that they may take and have it free from any incumbrances caused or made by the assured upon the same. Now, in the case at bar, the vessel was sold by the assured, and as it regarded them and the purchasers, the property specifically vested in the latter. Right or wrong as the sale might be considered, as between the assured and the underwriters, it was good as between the owners and the purchasers. At the time when the assured offered their abandonment, they knew that they had sold the vessel. They had nothing to cede or offer to the underwriters, but the proceeds of the sale. And the underwriters have not meddled with the proceeds ; so there has been no acceptance of the property which was abandoned, which was in the control of the assured. If the defendants had accepted the proceeds as offered, the act would have been a conclusive ratification, if done with a full knowledge of the circumstances. But nothing of that kind is pretended in the case at bar.

Again ; the assured do not contend, that they had any right to sell the vessel on account of any injury sustained by any risks within the policy. Yet they have sold the vessel. The right to do so must be ascribed to some other reason than to any derived under a policy, and that cause obviously was, that they were owners ; as such, they had a perfect right to sell her when and for what consideration they pleased. The purchasers might do what they pleased with the vessel after the sale, and the vendors would have no right to regulate the course which the vendees should pursue, nor to complain of the manner in which the vendees should manage the vessel ; whether they should keep and employ her on their own account, or sell her to any other persons. And the assured, who were the

former owners and vendors, would have as little legal reason to call the second purchasers to account, as they would have to interfere with the doings of the first purchasers. The argument, therefore, that the second purchasers have taken the vessel to themselves, and rendered no account to the first vendors, seems to us to be of no force, if she was taken under the sale by the vendees of the former owners, and not under their cession or abandonment. To what account were they entitled? They had sold, and their vendees had taken the actual possession of the vessel and had conveyed her to the defendants, for a valuable consideration. We are at a loss to perceive, that the defendants, by taking the vessel, under this new title and new consideration, were to render any account to the first vendors in this matter. It was not an acquisition under the abandonment, but under an independent right and title derived me diately from the first vendors themselves.

The defendants were undoubtedly desirous of obtaining the possession of the vessel as insurers, to repair her if any damage had happened to an extent for which they were liable under the policy, and to demonstrate that the plaintiff's claim for a total loss was utterly groundless, and then to restore her to the assured ; but they found the vendees of the master in the possession, standing upon their right. It was the sale of the vessel to Briggs and others for some other cause than sea damage within the policy, which prevented the defendants from carrying their original intent into effect ; which intent is legally to be inferred from the facts proved in the case.

Now the sale which was made by Captain Sawyer, was certainly good to pass his interest in the vessel to the vendees. As has been said, he was a part owner, and as between him and the purchasers his part vested in them. And it appears that he was the agent for the other owners to procure the policy. But he undertook to sell the whole vessel as she lay upon the beach, for the consideration paid to him by Briggs and others. If he was authorized to make the sale, by the other owners, so far as they were interested, then the title to the whole went with the possession to the vendees ; if he was not authorized originally, but his sale was adopted by the other owners and ratified by them, then also the property in the

Badger
v.
Ocean
Ins. Co.

whole vested in the vendees.   If the owners knew of the sale,
and did not disaffirm it in a reasonable time, they must be con-
sidered as having ratified it.   Now the facts in the case do
prove, that the master went to Portland, and that a communi-
cation was made by him to the other owners, and they joined
'n the offer of abandonment which accompanied the account
of the sale of the vessel.   This action is brought for the use
of Captain Sawyer, as well as for the other owners.   They
knew of the sale immediately after it was made, and they have
not to this day disaffirmed the sale, or any conduct of the mas-
ter in this matter.   The legal result is, that they have ratified
the sale which was made.   It was the owners then who pre-
vented the defendants from taking the vessel under the aban-
donment.

The question recurs, have the defendants accepted the offer
of abandonment, or adopted the sale as having been made for
any damage within the policy ?   We think such an inference is
not warranted by the facts.

In the case of *Peele* v. *The Merchants Ins. Co.* 3 Mason,
81, a proposition is laid down by the learned judge, which is
applicable to the case at bar.   " Whenever the underwriter
does any act in consequence of an abandonment, which can
be justified only under a right derived from it, that act is of it-
self decisive evidence of an acceptance, and cases may even
be put where the act of the underwriter, will in law prevail
over his express declarations."   In the case at bar the defend-
ants could not do any act under the abandonment, but were
prevented by the prior sale of the vessel to strangers.   Their
conduct may reasonably be ascribed to their purchase from the
vendees of the owners.   When the abandonment was offered,
the assured had no interest in the vessel.   The offer could only
embrace the proceeds of the sale.   Now acceptance is defined
to be an act by which one receives voluntarily, that which is
proposed, offered or given.   Is there a single circumstance in
the conduct of the defendants, which manifests such an accept-
ance ?   We think not.   It would be very unreasonable to
refer the conduct of the defendants to a cause clearly without
foundation, when it may be referred to a cause or reason which
is well supported.   The sale by auction might well be sustained

as between the vendors and the honest purchasers. The de-fendants may well admit the right of the owners to sell on their own account, and a ratification of such sale would operate as a confirmation of the title which was fairly derived from the first vendees ; a title, it should be remembered, acquired for a consideration wholly unconnected with and independent of the abandonment. The extent of the admission of the defendants was, that the assured had a right to sell the vessel to Briggs and others ; and that admission is satisfied by the fact, that they were the owners, and in that capacity might sell, and not that they as the assured had any right to sell for any cause within the policy.

We are all of opinion, that there is not sufficient evidence in the case arising from the conduct of the defendants, or oth-erwise, to prove that they have accepted the abandonment, or that the plaintiff is entitled to recover for a total loss.

By the agreement of the parties at the trial the case might, on motion of the plaintiff, be sent to an assessor to as-certain whether there has been any partial loss to an extent for which the defendants are liable, and the amount of the same. And the Court will receive such a motion, if the plaintiff shall think fit to make it. The assessor however is to allow only for such loss or damage as was occasioned by the perils of the sea and the stranding, and not for cutting away the masts and other unnecessary strip, waste and loss voluntarily committed and done by the master as the vessel lay upon the beach or other-wise